IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| JAMES DAYWALT,<br>　　　　*Plaintiff* | §<br>§<br>§ | |
| | § | SA-24-CV-00222-XR |
| -vs- | §<br>§ | |
| MICHAEL BLANQUIZ, RAMIRO J.<br>JUAREZ-RAMOS, RACHEL MENDEZ,<br>SAN ANTONIO POLICE<br>DEPARTMENT, CITY OF SAN<br>ANTONIO, JOHN AND JANE DOES 1-<br>100,<br>　　　　*Defendants* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | |

## ORDER ADOPTING REPORTS AND RECOMMENDATIONS

On this date, the Court considered United States Magistrate Judge Elizabeth S. Chestney's Reports and Recommendations ("R&Rs") in the above-numbered and styled case, filed January 23 and February 13, 2025 (ECF Nos. 15, 24), and several pending motions filed by Plaintiff.

After careful consideration, the Court adopts the Magistrate Judge's recommendation to grant Defendants' dispositive motions (ECF Nos. 6, 7) and denies Plaintiff's remaining motions for discovery, attorney sanctions, and leave to amend his complaint (ECF Nos. 17, 18, 21).

## BACKGROUND

Plaintiff James Daywalt, proceeding *pro se*, initiated this action against the San Antonio Police Department ("SAPD"), the City of San Antonio (the "City"), SAPD Officers Michael Blanquiz, Ramiro J. Ramos, and Rachel Mendez (collectively, the "Individual Officers"), and 100 Doe Defendants in March 2024. Plaintiff asserts claims under 42 U.S.C. § 1983 for violations of his rights under the First, Fourth, and Fourteenth Amendments to the U.S. Constitution. He also alleges violations of his rights under the Texas Constitutions and numerous state-law claims.

I.   **Factual Background**[1]

Mr. Daywalt alleges that, on September 8, 2023, he engaged in a peaceful protest on a public sidewalk outside of Pinnacle Bank in San Antonio, Texas. ECF No. 1 ¶¶ 10–13. Mr. Daywalt stood "silent[ly]" and held up a sign that stated: "Pinnacle Bank discriminates against minorities/disabled veterans." *Id.* ¶¶ 11–12. After some time, Defendant Blanquiz, a police officer with SAPD, arrived at Mr. Daywalt's location "in response to a call for service made by employees" of the Bank. ECF No. 12-1, Blanquiz Aff. at 1.

Officer Blanquiz approached Mr. Daywalt and told him that the bank employees "want to know what happened" to make him protest. ECF No. 7, Ex. B-1 (Blanquiz BWC). Mr. Daywalt explained that in November 2022, approximately ten months earlier, he was doing work as a code compliance officer for the City of San Antonio and had parked in the Pinnacle Bank parking lot. *Id.* According to Mr. Daywalt, he had "legally parked his vehicle in a parking space and at no point was he blocking anyone[.]" ECF No. 20, Daywalt Aff. at 2. He claimed that he was asked to move his car out of the parking lot by a bank employee "because of [his] accent." ECF No. 7, Ex. B-1 (Blanquiz BWC).

Officer Blanquiz told Mr. Daywalt, "You have a good day, sir," and began to walk back to his police car. *Id.* Mr. Daywalt said, "You tell them . . . I'll be here whenever I can, I'm gonna be here for a long time." *Id.* Officer Blanquiz replied, "That's fine," and warned him "to not pass out" because "it's hot." *Id.* Officer Blanquiz then opened the door to his vehicle and started to get in, but Mr. Daywalt continued speaking to him, so Officer Blanquiz walked back to Mr. Daywalt. *Id.*

Mr. Daywalt told Officer Blanquiz, "If they want to know, tell them I was discriminated against." *Id.* As Officer Blanquiz again walked back towards his car, Mr. Daywalt reiterated that

---

[1] This background is drawn both from the allegations in Plaintiff's complaint and the summary judgment record, which, unless otherwise noted, are consistent with one another.

he will be here for "a long time, today, tomorrow, and the next time." *Id.* Officer Blanquiz asked Mr. Daywalt for his name; Mr. Daywalt did not give his name but stated that the employees of the bank know who he is. *Id.* He mentioned that he wrote a letter to the bank—implying that it was about the alleged discrimination—and the bank employee took it as a threat. *Id.* They talked for a short while longer, and as Officer Blanquiz walked towards his car again, Mr. Daywalt asked, "I'm legal, right?" *Id.* Officer Blanquiz answered, "Yeah, I'm just having a conversation with you." *Id.* Officer Blanquiz then left to speak with the Pinnacle Bank employees. *Id.*; ECF No. 7, Ex. B-2 (Blanquiz BWC).

The bank employees showed Officer Blanquiz a letter and an email Mr. Daywalt had sent them. ECF No. 7, Ex. B-2 (Blanquiz BWC). Officer Blanquiz then went back outside to speak with Mr. Daywalt for a second time.[2] *Id.* He told Mr. Daywalt that he had read a print-out the email. *Id.* Mr. Daywalt confirmed that he had sent the email but denied that it was threatening.[3] *Id.*

Officer Blanquiz said, "We're about the same age, okay, without the cameras, you know, let's just talk like normal. They feel harassed. You won't harass me . . . . For a woman, they're in there crying." *Id.* Mr. Daywalt responded, "I'm not doing anything illegal." *Id.* Officer Blanquiz replied, "We aren't talking about this fucking sign. What you're doing to these women. . . ." *Id.* Mr. Daywalt said, "I'm not doing anything, sir." *Id.* Officer Blanquiz asked, "Really? Look at how you're dressed . . . . if I was her husband, I'd be pissed, because you're picking on my wife." *Id.* Mr. Daywalt replied, "I'm not picking on anyone's wife." *Id.* Officer Blanquiz said, "Then put it

---

[2] Plaintiff alleges that when Officer Blanquiz returned from the Bank, "his demeanor . . . had undergone a complete transformation." ECF No. 1 ¶ 17. He allegedly "became extremely abusive, using profanity, yelling, aggressively pointing fingers, intimidating, insulting, and harassing the Plaintiff," and that Officer Blanquiz accused him of the crime of harassment. *Id.* ¶ 18. He further alleges that Officer Blanquiz directed him to take his sign down and threatened him by saying, "I have your name!" *Id.* ¶ 20.

[3] In the video, Mr. Daywalt told Officer Blanquiz that he did write the email shown to him. In an affidavit submitted as summary judgment evidence, however, Mr. Daywalt asserted that he "has never emailed anything" to the bank employee. ECF No. 20, Daywalt Aff. at 2.

away. If it don't mean nothing, put it away. They're in there crying because they're scared of you." *Id.* Mr. Daywalt's response was unintelligible due to traffic noise. *Id.* Officer Blanquiz said, "Oh cause you're not doing nothing, that's just plain normal," gesturing towards Mr. Daywalt. *Id.*

Officer Blanquiz then stated, "I have your name." *Id.* In response, Mr. Daywalt asked for Officer Blanquiz's name. *Id.* Officer Blanquiz asked, "Did you call for me?", and Mr. Daywalt answered that he did not. *Id.* Officer Blanquiz then walked away and stated, "I'm engaging you, because you're walking around holding a sign about Pinnacle Bank," pointing to the sidewalk. *Id.* Mr. Daywalt responded, "Legal!" *Id.* Officer Blanquiz replied, "Yeah, legal. And their husbands have a right to protect their wives, too, legally." *Id.* Officer Blanquiz walked away, ending their interaction. *Id.*

After Officer Blanquiz left, Mr. Daywalt asserts that he called SAPD dispatch and requested that a supervisor meet with him. ECF No. 1 ¶ 25. Defendant Juarez-Ramos, another officer with SAPD, returned Mr. Daywalt's call. *Id.* ¶ 26. Officer Juarez-Ramos allegedly told Mr. Daywalt that he does have First Amendment rights but that his name would be sent to "a couple of units to deal with you," seemingly referring to SAPD units. ECF No. 1 ¶ 27. Plaintiff allegedly felt this was an explicit threat and "reluctantly terminated" his protest of the bank, "driven by the fear of . . . escalating actions from the SAPD." *Id.* ¶¶ 28–30.

Mr. Daywalt ultimately obtained the SAPD Offense/Incident Report prepared in connection with his protest on September 8, 2023.[4] *See* ECF No. 20, Ex. 1. The report, signed by Officer Blanquiz and Officer Christopher Winer, states that Mr. Daywalt "wasn't protesting

---

[4] On the day of his protest, Mr. Daywalt filed a public information request with the City of San Antonio, seeking "information related to a police investigation." ECF No. 22 at 5. The City, in turn, sent a Request for a Ruling to the Office of the Attorney General ("OAG"), stating it believed the records Mr. Daywalt requested are "excepted from required disclosure" due to the records being part of an "investigation [that is] currently open, or a person is pending prosecution." *Id.* The City claimed that releasing these records "would interfere with the detection, investigation, and prosecution of crime." *Id.* The OAG responded, "Upon review of your arguments and the submitted information, we conclude you may withhold the submitted information under section 552.108(a)(2)." *Id.* at 6.

4

anything he had written on [his] sign. [He] was there only to harrass [sic] or intimidate female employe[e]s at location." *Id.* It also states that Mr. Daywalt "continues to send emails and photos of [the bank employee's] personal vehicle to [the employee]." *Id.*

Mr. Daywalt spoke with Officer Juarez-Ramos again on September 19, 2023. ECF No. 7, Ex. C (Juarez-Ramos BWC). Mr. Daywalt sought clarification from Officer Juarez-Ramos "regarding the purpose of sending his name to other units or individuals." ECF No. 1 ¶ 32. Officer Juarez-Ramos replied, "Possibility of you being an active shooter in the future." ECF No. 7, Ex. C (Juarez-Ramos BWC). Mr. Daywalt asked whether he is serious, to which Officer Juarez-Ramos responded, "Yeah, we are 100% serious, sir. We deemed your actions inconsistent with normal behavior of somebody and . . . with the climate that we have now, it was prudent to forward your information over." *Id.* Mr. Daywalt insisted that he had no weapons and was merely peacefully protesting; Officer Juarez-Ramos responded, "And all we did was a peaceful report." *Id.*

Mr. Daywalt objected that "this is a violation of [his] rights," and Officer Juarez- Ramos countered that it is not a violation of his rights, as it was for "protection of society." *Id.* Officer Juarez-Ramos asked Mr. Daywalt multiple times to explain why his sign included that Pinnacle Bank discriminates against disabled veterans, considering there was no indication to the bank employee that he was a veteran. *Id.* Mr. Daywalt said, "I think maybe it was my accent." *Id.* Officer Juarez-Ramos pointed out the contradiction in this explanation: "An accent doesn't show you're a veteran. See how your actions are inconsistent with what you're protesting? That incident happened on November 10, 2022, almost a year ago, and it was a five-second interaction with you, and you're still out there to this day, and you're scaring the ladies . . . ." *Id.* When Mr. Daywalt interrupted, "My First Amendment--," Officer Juarez-Ramos cut him off, stating "That's correct sir, because you're practicing your First Amendment does not mean there [are] not consequences

5

for your First Amendment rights, all within reason. Nobody stopped you from being out there, nobody arrested you for it." *Id.* Mr. Daywalt argued that the officer had told him to take his sign down. *Id.* Officer Juarez-Ramos stated that his "actions dictated that we report this to somebody else. . . . It's just the power of the pen." *Id.* The call ended shortly thereafter.

Approximately one month later, "upon discovering that Defendant Juarez-Ramos had launched a criminal investigation" into him, Mr. Daywalt reached out to Defendant Mendez of SAPD Internal Affairs to file a complaint. ECF No. 1 ¶ 39. He spoke with her three times, and each of these calls was recorded. ECF No. 7, Mendez Recordings, Exs. D–F.

In the first conversation, Mr. Daywalt told Sargeant Mendez that he wanted to file a complaint against Officer Juarez-Ramos, separate from his complaint against Officer Blanquiz. *Id.*, Ex. D. He told her that Officer Juarez-Ramos reportedly forwarded his name "to two agencies, or something like that" and had told him he was a "future active shooter," which would be documented. *Id.* Sergeant Mendez asked, "So your complaint is what he told you?" *Id.* He answered, "Right, he can't tell me. . . that I'm a future active shooter. He said he's going to put that in a report. And essentially that's a Fourth Amendment rights violation because he has no right to get my name and put it in any kind of report." *Id.* Sergeant Mendez told him that she would look into the matter, see if his calls with Officer Juarez-Ramos were documented, and then call him back. *Id.*

When Sergeant Mendez called Mr. Daywalt back, she informed him that she had listened to his call with Officer Juarez-Ramos and heard him say that Mr. Daywalt's name was forwarded to other units. She explained,

> [Forwarding a name to other units] is not uncommon in our department if there are situations where it looks like, and I kinda reviewed a little bit of the originating incident where you're at the bank, and you're exercising your rights to protest which I can see in the video, and the supervisor at

6

>some point advises the officer that as long as you're in the street and you're exercising your rights then that's your right. What becomes concerning though is the bank employees are, kind of, in fear as far as the actions that you're taking toward a specific employee.

*Id.*, Ex. E.

Mr. Daywalt began to explain, "I was holding a sign that says . . ." *Id.* She interrupted and told him, "No I'm not talking about that part of it. I guess there was something mentioned about the employee . . . felt that you had gone and taken a photo of her vehicle, that you knew who she was, that you knew her name, and so she is fearful that you're specifically targeting her, not necessarily the bank in general." *Id.* Mr. Daywalt responded that he had been targeting the bank and that the sign only referenced the bank. *Id.* Sergeant Mendez again clarified that she was not talking about his protest with the sign; she was talking about "other additional information that the bank employee was concerned about." *Id.*

Sergeant Mendez asked him whether he had approached the bank employee or taken a photo of her vehicle. *Id.* He denied approaching the employee but admitted to taking a photo of her vehicle "in the past." *Id.* She responded, "Okay. So those are the actions that were concerning to her, and so that's what the officer, when he reported that to our units . . . under SAPD . . . was basically to let them know 'hey this is what's going on,' just to be aware of it." *Id.*

Sergeant Mendez asked Mr. Daywalt if he had written any books, and he said he had. *Id.* She explained, "I think that's kinda where that conversation came from. Did you write a book about active shooters or self-defense?" *Id.* He answered, "Yes, how to *defend* yourself against active shooters." *Id.* She told him that she thought that was why the term "active shooter" came up in his conversation with Officer Juarez-Ramos and "you have a right to protest, sure, we just don't want it to escalate to something more." *Id.* Mr. Daywalt asserted that there needs to be a "basis" for calling him a future active shooter. *Id.*

7

Sergeant Mendez offered to listen to the recording of his second call with Officer Juarez-Ramos again, but warned that, having heard it before, she did not remember the Officer saying, "Yes, you're gonna be an active shooter." *Id.* Mr. Daywalt reiterated that forwarding his name to other units as a possible active shooter was a Fourth Amendment violation. *Id.* She clarified again, "You protesting was not the issue with the females from my understanding. . . . I understand it happened in the past . . . but you taking a photo of her vehicle, and seeking out her information, it just scared her. . . . I think for her you coming to the place of business, it just alarmed her again." *Id.* Sergeant Mendez stated that the statements were being investigated and that she would call him back after listening to the recording of his call with Officer Juarez-Ramos again. *Id.*

Sergeant Mendez called Mr. Daywalt back, beginning their third conversation. *Id.*, Ex. F. She stated that she re-listened to the recording and that "it sounds like he does say something to the effect of 'You could possibly become an active shooter.' So understand . . . he does have the ability to share information with other units within our department . . . because of the totality of the circumstances surrounding the entire incident, not just the fact that you were protesting." *Id.* She told him she would document his complaint but that there was "no policy or procedure violation" by Officer Juarez-Ramos for this specific complaint. *Id.*

Mr. Daywalt stated that he was a former federal agent and asked her to clarify which agencies his name was being reported to. *Id.* She explained that, from what she understood, it was "just within [SAPD]." *Id.* He asked whether this meant he was on a no-fly list. She answered, "No, no. . . . Just within our agency . . . Like I said before, you have a right to protest, that's completely fine." *Id.* He then asked if this would affect him renewing his license to carry firearms. *Id.* She stated that she has no control over what is looked at when he gets his firearms license renewed and explained again that, from what she understands, the officer only contacted SAPD's internal units

8

about the incident. *Id.* He apologized for arguing with her but expressed frustration that he was being called a future active shooter "just for holding a sign" despite him being retired military and having no criminal record. *Id.* The call ended shortly after.

## II. Procedural History

Plaintiff initiated this action in March 1, 2024. ECF No. 1. The City and the Individual Officers filed motions to dismiss on March 28 and 29, respectively. *See* ECF Nos. 6, 7. Plaintiff did not respond to either motion.

In September 2024, the Court referred the motions to the Magistrate Judge, who directed Plaintiff to file an amended complaint in response to Defendants' motions by no later than October 16, 2024:

> [D]ue to Plaintiff's pro se status, the Court will allow Plaintiff one opportunity to amend his pleadings and address the issues raised in Defendants' motions to dismiss before issuing a recommendation on the motions. If Plaintiff chooses not to amend his Complaint, the Court will address Defendants' motions to dismiss on their merits. If Plaintiff chooses to amend his Complaint, the Court will dismiss Defendants' motions to dismiss as moot, and Defendants may file renewed motions to dismiss as to the amended pleading if they still believe it to be deficient.

ECF No. 10 at 2. Plaintiff did not amend his complaint in response to the Magistrate Judge's order.

In December 2024, the Magistrate Judge converted the Individual Officers' motion to dismiss to a motion for summary judgment under Rule 12(d) and directed the parties to file any summary judgment evidence by January 31, 2025. *See* ECF Nos. 11, 14. On January 30, Plaintiff filed his summary judgment evidence (ECF Nos. 20, 22), along with a motion seeking leave to file an amended complaint (ECF Nos. 21), a motion to compel discovery (ECF No. 18), and a motion for sanctions against counsel for the Individual Officers (ECF No. 17).

### III.     The Magistrate Judge's Recommendations

On January 23, 2025, the Magistrate Judge issued an R&R recommending that Plaintiff's claims against the SAPD be dismissed because it lacks independent jural authority to sue and be sued under Texas law. ECF No. 15 at 7–8. The Magistrate Judge further recommended that the Court dismiss Plaintiff's § 1983 claims against the City because his complaint failed to allege any of the elements required to establish municipal liability under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). *Id.* at 8–9. Finally, the Magistrate Judge recommended that the Court dismiss Plaintiff's state-law claims against the City for lack of subject matter jurisdiction. *Id.* at 9–10.

On February 13, 2025, after reviewing video footage of the incident and Plaintiff's evidentiary submissions, the Magistrate Judge issued an R&R recommending that the Court grant summary judgment on Plaintiff's Section 1983 claims based on qualified immunity because Plaintiff had not shown a violation of his clearly established rights, reasoning that:

- Plaintiff's First Amendment claims failed because he was permitted to continue protesting, and neither investigations by public officials nor false accusations are actionable as injuries under the First Amendment, *id.* at 14–20;[5]

- Plaintiff's Fourth Amendment claim failed because he did not proffer any evidence of a search or seizure that would trigger constitutional scrutiny *id.* at 20–22;[6] and,

- Plaintiff's Fourth Amendment claim for malicious prosecution failed because he did not proffer any evidence of a criminal proceeding against him, *id.* at 22–23.[7]

---

[5] Simply because someone is "engaging in speech," does not mean "officers cannot execute their law enforcement duties." *Grisham v. Valenciano*, 93 F.4th 903, 909 (5th Cir. 2024). "Rather, officers cannot execute their law enforcement duties . . . in retaliation of speech or as imposed censorship." *Id.* Moreover, the Fifth Circuit has explicitly held that, even though harms such as "an investigation . . . and false accusations . . . may chill speech, [they] are not actionable." *Colson v. Grohman*, 174 F.3d 498, 512 (5th Cir. 1999).

[6] Plaintiff's encounter with Officer Blanquiz did not constitute a seizure because the encounter was consensual. *Florida v. Bostick*, 501 U.S. 429, 434–35 (1991). Officer Blanquiz began to leave the scene *multiple* times, but he walked back towards Mr. Daywalt when Mr. Daywalt continued speaking to him. Mr. Daywalt's claim that Officer Juarez-Ramos violated the Fourth Amendment by forwarding Mr. Daywalt's name to other SAPD units fails because no authority exists to suggest that such internal reporting would constitute a search, let alone an illegal search.

[7] *Espinal v. City of Hous.*, 96 F.4th 741, 748 (5th Cir. 2024) (first element of a malicious-prosecution claim is "the commencement or continuance of an original criminal proceeding").

The Magistrate Judge further recommended that Plaintiff's claims for civil conspiracy under 18 U.S.C. § 241 and 42 U.S.C. § 1985 be dismissed as the former does not provide a basis for civil liability, and the latter requires a violation of constitutional rights, which Plaintiff had not established.[8] *Id.* at 23–24. Finally, she recommended that the Court dismiss Plaintiff's state-law claims without prejudice for lack of subject matter jurisdiction. *Id.* at 24–25.

## DISCUSSION[9]

### I. The Magistrate Judge's R&Rs

#### A. Legal Standard

A party may serve and file objections to a Report and Recommendations within fourteen days. FED. R. CIV. P. 72(a), (b)(2). "Parties filing objections must specifically identify those findings objected to. Frivolous, conclusive [sic] or general objections need not be considered by the district court." *Nettles v. Wainwright*, 677 F.2d 404, 410 n.8 (5th Cir. 1982), *overruled on other grounds by Douglass v. United States Auto. Ass'n*, 79 F.3d 1415 (5th Cir. 1996).

---

[8] *See Gill v. Texas*, 153 F. App'x 261, 262 (5th Cir. 2005) (per curiam) (18 U.S.C. § 241 "do[es] not provide a basis for civil liability"); *McCoy v. Homestead Studio Suites Hotels*, 177 F. App'x 442, 446 (5th Cir. 2006) (to establish a claim under 42 U.S.C. § 1985, "a plaintiff must demonstrate: (1) a conspiracy between two or more people, (2) for the purpose of depriving a person or class of the equal protection of the laws, and (3) an act that furthers the conspiracy, (4) *whereby a person is injured in his person or property or denied any right or privilege of a citizen of the United States*" (emphasis added)).

[9] Plaintiff is proceeding *pro se* in this case. When reviewing a *pro se* plaintiff's complaint, the Court must construe the allegations liberally, holding the *pro se* to less stringent pleading standards than those applicable to lawyers. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Still, a party's *pro se* status does not offer him "an impenetrable shield, for one acting *pro se* has no license to harass others, clog the judicial machinery with meritless litigation and abuse already overloaded court dockets." *Ferguson v. MBank Houston, N.A.*, 808 F.2d 358, 359 (5th Cir. 1986). Whether represented by counsel or appearing *pro se*, plaintiffs must still present specific facts, rather than conclusory allegations, to avoid a Rule 12(b)(6) dismissal. *Guidry v. Bank of LaPlace*, 954 F.2d 278, 281 (5th Cir. 1992).

While courts "liberally construe briefs of *pro se* litigants and apply less stringent standards to parties proceeding *pro se* than to parties represented by counsel, *pro se* parties must still brief the issues and reasonably comply with [federal procedural rules]." *U.S. Bank Nat'l Ass'n v. Johnson*, No. 1:15-CV-788-RP, 2017 WL 598499, at *2 (W.D. Tex. Feb. 14, 2017) (quoting *Grant v. Cuellar*, 59 F.3d 524, 524 (5th Cir. 1995). "The notice afforded by the Rules of Civil Procedure and the local rules" is "'sufficient' to advise a *pro se* party of their burden in opposing a summary judgment motion." *Johnson*, 2017 WL 598499, at *2 (citing *Martin v. Harrison Cnty. Jail*, 975 F.2d 192, 193 (5th Cir. 1992)). Likewise, "*pro se* status does not exempt [a litigant] from the usual evidentiary requirements of summary judgment." *Id.* (citing *Ellis v. Principi*, 246 F. App'x 867, 869 (5th Cir. Sept. 5, 2007) (per curiam)).

11

Courts must review *de novo* any of the Magistrate Judge's conclusions to which a party has specifically objected. *See* 28 U.S.C. § 636(b)(1) ("A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."). Any sections that were not clearly objected to are reviewed for clear error to determine whether they are contrary to law. *Id.*; *see also United States v. Wilson*, 864 F.2d 1219, 1221 (5th Cir. 1989), *cert. denied*, 492 U.S. 918 (1989).

### B.     Analysis

Plaintiff was served with copies of the R&Rs on the City's motion to dismiss and on the Individual Officers' motion for summary judgment on January 29 and February 21, 2025, respectively. *See* ECF Nos. 23, 26. Plaintiff has not filed any objections to either R&R, and the time to do so has expired. Accordingly, the Court need not conduct a *de novo* review of the Magistrate Judge's analysis of either motion. *See* 28 U.S.C. § 636(b)(1). The Court has reviewed the R&Rs and finds them to be neither clearly erroneous nor contrary to law.

For the reasons stated herein, the Court **ADOPTS** both R&Rs as to Plaintiff's federal claims but **REJECTS** the recommendation to decline supplemental jurisdiction over Plaintiff's state-law claims and dismisses those claims as a matter of law.

#### 1.     The City and SAPD's Motion to Dismiss (ECF No. 6)

The Court accepts the Magistrate Judge's recommendations that Plaintiff's claims against the SAPD be dismissed and that Plaintiff's federal claims against the City be dismissed. Accordingly, those claims are **DISMISSED WITH PREJUDICE**.

The Court rejects the Magistrate Judge's recommendation to dismiss Plaintiff's state-law claims against the City for lack of subject matter jurisdiction, however, and will exercise supplemental jurisdiction over those claims under 28 U.S.C. § 1367.

Plaintiff asserts state-law claims against the City for (1) abuse of process, (2) defamation, (3) false imprisonment, (4) negligent hiring, training, and supervision, and (5) violations of the Texas Penal Code's prohibitions against abuse of official capacity (§ 39.02), official oppression (§ 39.03), making a false alarm or report (§ 42.06), and misuse of official information (§ 39.06). *See* ECF No. 1. These claims against the City are barred by the Texas Tort Claims Act ("TTCA").

The TTCA provides the sole avenue for relief against government entities and only for "personal injury and death so caused by a condition or use of tangible personal or real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law." TEX. CIV. PRAC. & REM. CODE § 101.021. Thus, "to sue a governmental unit under the Act's limited waiver [of immunity], a plaintiff may allege an injury caused by negligently using tangible personal property[.]" *City of Watauga v. Gordon*, 434 S.W.3d 586, 589 (Tex. 2014).

Texas has not waived governmental immunity for intentional torts, including abuse of process, defamation, and false imprisonment. TEX. CIV. PRAC. & REM. CODE § 101.057(2) (excluding claims arising out of assault, battery, false imprisonment, or any other intentional tort from waiver of immunity); *Travis v. City of Grand Prairie*, 654 F. App'x 161, 167 (5th Cir. 2016) (noting that municipalities are immune from claims for defamation and malicious prosecution); *Moore v. Bushman*, 559 S.W.3d 645, 652 (Tex. App.—Houston [14th Dist.] 2018, no pet.) (describing elements of abuse of process). Accordingly, the City is immune from Plaintiff's state-law claims for abuse of process, defamation, and false imprisonment. *Tex. Dep't of Pub. Safety v. Petta*, 44 S.W.3d 575, 580 (Tex. 2001).

Plaintiff's claims against the City for negligent hiring, training, and supervision do not fall within the scope of its immunity for intentional torts. *See Young v. Dimmitt*, 787 S.W.2d 50, 51 (Tex. 1990). "But a cause of action for negligent supervision or training must satisfy the TTCA's

use of tangible property requirement." *Texas Dep't of Crim. Just.-Cmty. Just. Assistance Div. v. Campos*, 384 S.W.3d 810, 815 (Tex. 2012). Plaintiff's claims do not.

Plaintiff's claims for violations of the Texas Penal Code fail as a matter of law because the Code does not create a private right of action (and otherwise sound in intentional torts). *See* Tex. Const. art. I, § 30(e); *see also Spurlock v. Johnson*, 94 S.W.3d 655, 658 (Tex. App.—San Antonio 2002, no pet.) ("the Texas Penal Code does not create private causes of action").

Accordingly, Plaintiff's state-law claims against the City and SAPD are **DISMISSED WITH PREJUDICE**.

### 2. The Individual Officers' Motion for Summary Judgment (ECF No. 7)

The Court accepts the Magistrate Judge's recommendation that the Court grant summary judgment as to Plaintiff's federal claims against the Individual Officers. Accordingly, those claims are **DISMISSED WITH PREJUDICE**.

The Court rejects the Magistrate Judge's recommendation to dismiss Plaintiff's state-law claims against the Individual Officers for lack of subject matter jurisdiction, however, and will exercise supplemental jurisdiction over those claims under 28 U.S.C. § 1367.

Plaintiff's claim that the Individual Officers violated Section 8 of the Texas Constitution fails as a matter of law. This provision of the Texas Constitution does not provide for a civil cause of action. "[T]here is no independent cause of action for damages against governmental entities for violations of the free speech and assembly clauses of the Texas Constitution." *City of Beaumont v. Bouillion*, 896 S.W.2d 143, 150 (Tex. 1995).

And, as with his claims against the City, Plaintiff's claims against the Individual Officers for violations of the Texas Penal Code fail because the Code does not create a private right of action. *Spurlock*, 94 S.W.3d at 658.

Finally, Plaintiff's state-law tort claims against the Individual Officers are barred by the TTCA because Plaintiff could have brought—and did bring—the same claims against the City. Section 101.106(f) of the TTCA, entitled "Election of Remedies," provides:

> If a suit is filed against an employee of a governmental unit based on conduct within the general scope of that employee's employment and if it could have been brought under [the TTCA] against the governmental unit, the suit is considered to be against the employee in the employee's official capacity only. On the employee's motion, the suit against the employee shall be dismissed unless the plaintiff files amended pleadings dismissing the employee and naming the governmental unit as defendant on or before the 30th day after . . . the motion is filed.

TEX. CIV. PRAC. & REM. CODE § 101.106(f).

As defined in section 101.106(f), a governmental employee is effectively sued in an official capacity when the suit (1) is "based on conduct within the general scope of that employee's employment" and (2) "could have been brought under [the TTCA] against the governmental unit." *Id.* at 394. Even when the plaintiff purports to bring the claims against the employee in their individual capacity, the claims will be deemed official capacity claims subject to section 101.106(f) if these conditions are met. By adopting section 101.106(f), the Legislature has effectively mandated that only a governmental unit can be sued for a governmental employee's work-related tortious conduct. *Garza v. Harrison*, 574 S.W.3d 389, 393–94 (Tex. 2019).

For purposes of section 101.106(f), the employee's state of mind, motives, and competency are irrelevant so long as the conduct itself was pursuant to the employee's job responsibilities." *Garza*, 574 S.W.3d at 401. Even intentional torts can be within the scope of employment.[10] All

---

[10] *See Hundall v. Univ. of Tex. at El Paso*, No. EP-13-00365-DCG, 2014 WL 12496895 (W.D. Tex. Feb. 21, 2014) ("Plaintiff's claims for invasion of privacy, defamation, libel, slander, civil conspiracy, fraud, harassment, victimization, negligence, gross negligence, assault, malice, and medical malpractice all arise from communications and interactions with the individual defendants at UTEP. Since Plaintiff consistently and repeatedly asserts throughout the complaint that the individual defendants were acting as "agent[s] of UTEP," the Court finds no reason to conclude to the contrary and thus finds that the first prong is satisfied."); *Valentine v. City of Austin*, No. A-15-CV-482, 2015 WL 12942440, at *5 (W.D. Tex. Nov. 10, 2015) ("Thus, any fraud or other intentional tort claims Valentine would seek to bring against the individual police officers defendants would be foreclosed by §101.106(f)."), *report and recommendation adopted in relevant part by* 2016 WL 7756808, at *2 (W.D. Tex. Jan. 20, 2016).

common-law tort theories alleged against a governmental unit are assumed to be "under the Tort Claims Act" and thus could have been brought against the governmental unit, even if the governmental unit's immunity is not waived by the Act.[11]

Here, there is no genuine dispute that the scope of employment prong is met. Moreover, because Plaintiff's claims sound in tort, they "could have been brought"—and were in fact brought—against the governmental employer. The conditions of section 101.106(f) are satisfied as to the claims for abuse of process, defamation, and false imprisonment alleged against the Individual Defendants. Accordingly, those claims fail as a matter of law.

In sum, Plaintiff's claims against the Individual Officers are **DISMISSED WITH PREJUDICE**.

### II.     Plaintiff's Motions for Leave to Amend, Discovery, and Attorney Sanctions

#### A.     Motion for Leave to File an Amended Complaint (ECF No. 21)

Plaintiff's motions for leave to file an amended complaint (ECF No. 21) is **DENIED**.

Plaintiff seeks to add SAPD Officer Christopher Winer as a defendant. ECF No. 21. Apparently, Officer Winer created an internal report investigating whether Plaintiff posed some form of threat. Plaintiff seeks to bring causes of action against Officer Winer for official misconduct, abuse of authority, and violation of Plaintiff's due process rights.

Although the Court "should freely give leave [to amend] when justice so requires," FED. R. CIV. P. 15(a)(2), leave to amend is not automatic. *N. Cypress Med. Center Operating Co., Ltd. v. Aetna Life Ins. Co.*, 898 F.3d 461, 477 (5th Cir. 2018). In exercising its discretion, the district court considers such factors as "undue delay, bad faith or dilatory motive on the part of the movant,

---

[11] *See also Franka v. Velasquez*, 332 S.W.3d 367, 382 (Tex. 2011) ("This construction of section 101.106(f) does, however, foreclose suit against a government employee in his individual capacity if he was acting within the scope of employment."); *Wilkerson v. Univ. of N. Tex.*, 878 F.3d 147, 158 (5th Cir. 2017) ("Though Wilkerson alleges she acted in her personal capacity, Glazebrook gets governmental immunity.").

repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowing the amendment, and futility of amendment." *Id*. "An amendment is futile if it would fail to survive a Rule 12(b)(6) motion." *Id.* at 478.

Plaintiff has already been afforded two opportunities to amend his complaint in response to Defendants' motions—first, within 21 days after the motions were filed, and then again, over six months later, after the motions were referred to the Magistrate Judge. Plaintiff failed to amend his complaint on either occasion. In addition to this undue delay, any amendment joining Winer as a defendant would be futile. Any federal claim against him—presumably for malicious prosecution—would fail for the same reasons Plaintiff's civil rights claims against the Individuals Defendants failed, and any claims sounding in state tort law would be barred by the TTCA.

Accordingly, Plaintiff's motion for leave to file an amended complaint is **DENIED**.

### B. Motion to Compel Discovery (ECF No. 18)

Plaintiff's motion to compel (ECF No. 18) seeking certain evidence is **DENIED AS MOOT** because the evidence he seeks is not germane to any of the legal issues that form the basis of this order.

### C. "Request for Court Intervention" (ECF No. 17)

Plaintiff's "request for court intervention" (ECF No. 17) complaining that Defendants' counsel made statements he found to be bigoted and unethical is **DENIED**.

Plaintiff objects to the characterization of his protest activity in the Individual Defendants' motion for summary judgment as a "grudge against an employee over a parking dispute." ECF No. 17 at 1–2; *see* ECF No. 7 at 9 n.4. Plaintiff further objects to the characterization of his email to the bank as "threatening." ECF No. 17 at 3; *see* ECF No. 7 at 9 n.4. Plaintiff's mere disagreement with this characterization of his conduct does not render the statements sanctionable.

## CONCLUSION

For the foregoing reasons, the Court adopts the Magistrate Judge's recommendations, and it is hereby **ORDERED** that:

The City of San Antonio and San Antonio Police Department's motion to dismiss (ECF No. 6) is **GRANTED**;

The Individual Officers' motion for summary judgment (ECF No. 7) is **GRANTED**;

Plaintiff's claims against Does 1–100, who have not been identified nor served, are **DISMISSED WITHOUT PREJUDICE** pursuant to Rule 4(m); and

All remaining motions (ECF Nos. 17, 18, 21) are **DENIED**.

A final judgment will follow pursuant to Rule 58.

The Clerk is **DIRECTED** to mail a copy of this Order and the Final Judgment to James Daywalt at 9338 Mimosa Manor, San Antonio, Texas 78245.

This case is **CLOSED**.

It is so **ORDERED**.

**SIGNED** this 12th day of March, 2025.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE